UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:

KARIN BURRELL as personal
representative of the Estate of
SCOTT BURRELL, Deceased,
KARIN BURRELL as surviving spouse of
SCOTT BURRELL and their two minor daughters
M.B.(1) and M.B.(2).

Plaintiffs,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
a Florida corporation, and;
SCOTT ISRAEL, in his official capacity
as Sheriff of Broward County, Florida, and;
STANLEY FRANKOWITZ D.O.,
JOHN MARTIN M.D.,
SCOTT KESSON,
PHYSICIAN'S ASSISTANT KAREN MIZRAHY,
NURSE JERI MONICAL,
L.P.N. JUDITH JONES,
NURSE CYNTHIA MCDONALD,
L.P.N. PATRICIA RELL, each individually and as employees of
ARMOR CORRECTIONAL HEALTH SERVICES, INC.

Defendants.

**COMPLAINT**

The Plaintiff, KARIN BURRELL, as personal representative of the Estate of SCOTT BURRELL, Decedent, on behalf of herself as the surviving spouse of sixteen years, Mr. Burrell's estate and on behalf of their two minor children M.B.1 and M.B.2, sues Defendants, jointly and severally, and alleges:

**PRELIMINARY STATEMENT**

1. Scott Burrell, Stephen Obremski, and April Farrah all died horrible and preventable deaths in Defendant SCOTT ISRAEL's North Broward Bureau jail (hereinafter NBB) in April and May of 2016. All three of these inmates were severely mentally ill. After an investigation, Defendant Armor Correctional Health Svcs., Inc., (hereinafter ARMOR) concluded that these three inmates died because they were not promply transferred to an outside hospital for care. (Ex. 1. – 4-page document regarding the deaths and findings on page four). The first death involved Scott Burrell who was so severely mentally ill that he thought he was working for the C.I.A. ARMOR and its employees neglected his mental illness and allowed him to die in solitary confinement, covered in his urine and feces, from a common and easily treatable abdominal infection on April 1, 2016. Mr. Burrell left behind two teenage daughters, and a loving and devoted wife of sixteen years. Stephen Obremski was mentally ill and a decade earlier was involved in a motorcycle accident where he lost his left leg below the knee and has since been reliant on churches to get around. ARMOR and its employees allowed Mr. Obremski to die in solitary confinement, without the crutches he needed to walk, wearing an adult diaper, from a common and easily treatable abdominal infection on April 4, 2016. Mr. Obremski was under the care of the same doctors and nurses who neglected Mr. Burrell until he died. Mr. Obremski was survived by a loving wife, a minor daughter, and a minor autistic son. April Farrah was a severely mentally ill woman who suffered a catastrophic gastrointestinal bleed in the jail. The bleed was so significant that jail employees could not clean up all the blood themselves, so they called a hazmat team

to clean the cell. After the massive bleed, Ms. Farrah was kept in the jail for another 24 hours until her heart failed and she died on May 19, 2016. Ms. Farrah was under the care of the same ARMOR doctors and nurses as Mr. Burrell and Mr. Obremski. These three deaths are not some anomaly, but the continuation of a consistent pattern of deliberate indifference on the part of ARMOR, its employees, and Broward Sheriff's Office (hereinafter BSO) that is both morally and legally indefensible and has been ongoing for years.

2. The unconstitutional healthcare provided by ARMOR which is a result of its profit motivated cost cutting combined with the lack of oversight by BSO has resulted in at least ten horrible and preventable deaths since 2011, including those listed below, which will be fully described later in this complaint:

a. February 17, 2011, William Campbell, a mentally ill man who had been arrested for DUI, died of sepsis;

b. October 10, 2011, Gary Joseph Smith, a mentally ill man who had been arrested for possession of cocaine, died of pneumonia;

c. January 3, 2012, Calvin Goldsmith, a mentally ill man who had been arrested for trespassing, died of sepsis;

d. July 7, 2012, Mr. Sacco, a mentally ill man who was arrested for a misdemeanor died from sepsis;

e. July 10, 2012, Mr. Priester, a severely mentally ill man, was found dead in his cell. He had lost 120 pounds during his 155 days in jail and died from starvation;

f. December 24, 2012, William Herring Jr., a severely mentally ill man, who

was arrested when sleeping on a bus bench died from starvation;

g. January 7, 2015, Simon Valacheryil, a mentally ill man died from a gastrointestinal bleed and infectious pericarditis;

h. April 1, 2016, Scott Burrell, a mentally ill man died of peritonitis from a bowel perforation;

i. April 5, 2016, Stephen Obremski, a mentally ill man who had been arrested for a DUI died from a gastrointestinal hemorrhage;

j. May 16, 2016, April Farrah, a mentally ill woman who had been arrested for having an open container of beer died from a gastrointestinal hemorrhage.

3. Since 2004 BSO has paid ARMOR approximately $350,000,000 based on a fundamentally flawed contract with perverse incentives for ARMOR and equally perverse disincentives for BSO. The flaws in the contract are that ARMOR is paid a flat fee of $25,000,000 per year to provide all healthcare within the Broward County Jail system. Therefore, because this is a flat fee, ARMOR is incentivized to reduce costs by offering as little care as possible so as not to reduce its flat fee amount. Simultaneously, ARMOR has agreed to completely indemnify BSO as well as pay BSO's legal fees and any civil judgments that arise from the provision of healthcare in the jails this thereby *dis*incentivizes BSO from exercising robust oversight of ARMOR because BSO has no financial skin in the game. The predictable and tragic result of this combination of incentives and disincentives is unnecessary injury and death. (Exhibit 2. Contract 2014-2017 at pages 33-34, 45-46).

**JURISDICTION**

4. Counts 1 - 10 of this action are brought pursuant to 42 U.S.C. §1983, and Eighth and the Fourteenth Amendments to the United States Constitution as Mr. Burrell was a pretrial detainee at all relevant times. Jurisdiction is based upon 28 U.S.C. §1331, §1343, and 42 U.S.C. § 1983 and §1988.

5. Counts 11 - 16 are based on state law negligence and in each state law count the Plaintiff claims damages well in excess of the jurisdictional threshold amount of $15,000.

6. The federal violations were committed as a result of the deliberate indifference of all of the Defendants.

7. The acts and practices constituting the violations alleged below have occurred within the jurisdiction of the United States District Court in and for the Southern District of Florida. In connection with the acts, practices, and violations alleged herein, each Defendant has, directly or indirectly, violated the constitutional rights of Mr. Burrell.

8. All conditions precedent under Florida law to the filing of this lawsuit have been satisfied.

a. Plaintiff has put all governmental entities on notice as required by § 768 of the Florida Statutes.

b. Plaintiff complied with all pre-suit medical malpractice procedures as required by Chapter 766 of the Florida Statutes.

9. The above-listed Plaintiffs, through Personal Representative, Karin Burrell, seek an award of damages for mental and emotional injuries, economic damages for the estate, funeral expenses for Paul Burrell specifically, punitive damages, court costs and attorney

fees. The Personal Representative of the Estate of Stephen Burrell also claims survival damages under Section 46.021, Florida Statutes, as Mr. Burrell suffered past physical, mental, emotional pain and suffering, disfigurement and loss of enjoyment of life when he was held in the Broward County Jail.

**PARTIES**

10. Mr. Burrell and his Personal Representative, at all times material hereto, have been residents of Broward County, Florida.

11. The Defendant, SCOTT ISRAEL, (hereinafter ISRAEL or BSO) is the Sheriff of Broward County. Said Defendant is responsible, as Sheriff, for the conduct of ARMOR and its employees as he has retained ARMOR to provide medical care for all inmates in the Broward County Jail. ISRAEL is also responsible, as Sheriff, for the conduct of all deputies and corrections officers in his employ and ensuring that his deputies, corrections officers, employees, servants, and agents obey the laws of the State of Florida and the United States. Said Defendant is being sued in his official capacity.

12. The Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., (hereinafter ARMOR) is a Florida Corporation, organized and existing under the laws of the State of Florida, conducting business in Broward County, Florida.

13. The Defendant STANLEY FRANKOWITZ D.O. (hereinafter FRANKOWITZ) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in his individual capacity.

14. The Defendant JOHN MARTIN M.D. (hereinafter MARTIN) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being

sued in his individual capacity.

15. The Defendant SCOTT KESSON (hereinafter KESSON) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in his individual capacity.

16. The Defendant KAREN MIZRAHY (hereinafter MIZRAHY) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in her individual capacity.

17. The Defendant Nurse JERI MONICAL (hereinafter MONICAL) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in her individual capacity.

18. The Defendant LPN JUDITH JONES (hereinafter JONES) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in her individual capacity.

19. The Defendant Nurse CYNTHIA MCDONALD (hereinafter MCDONALD) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in her individual capacity.

20. The Defendant LPN PATRICIA RELL (hereinafter RELL) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in her individual capacity.

21. At all times material hereto, and in all their acts described herein, the Defendants were acting under color of state law and color of their authority as public officials, public employees or employees of ARMOR.

22. The wrongful actions of the Defendants constituted deliberate indifference to Mr.

Burrell's serious medical condition and caused his death.

**ALLEGATIONS OF FACTS**

23. On January 18, 2016, Scott Burrell (hereinafter Mr. Burrell) was booked into the Broward County Jail. He was 62 years old at the time. In the sixteen years prior to his death he had been married to Karin Burrell and up until his last manic episode Mr. Burrell had worked hard to manage his bipolar disorder. The attached photos are of Mr. Burrell's wedding to Karin Burrell sixteen years ago and a photo of him fishing taken several weeks before his last manic episode that led to his arrest. (Ex. 3 and 4.) The same pastor that married Mr. Burrell to Karin Burrell also presided over Mr. Burrell's funeral.

24. At intake, Mr. Burrell was identified as being bipolar. He reported that he was hospitalized for a serious psychiatric illness just days before his arrest. At this time ARMOR's employees concluded that Mr. Burrell was physically healthy and psychologically stable.

25. On February 24, 2016, Dr. Charles Dack, a psychiatrist employed by ARMOR, examined Mr. Burrell. Mr. Burrell stated that this was his first time in jail and that he felt that he was on the edge of a manic episode. Mr. Burrell reported that he had been taking Klonopin, Cymbalta, and Trileptal for years to manage his bipolar disorder. Dr. Dack placed an order for Mr. Burrell to receive Trileptal.

26. On February 27, 2016, Mr. Burrell appeared before Judge Williams for a hearing. Judge Williams observed that Mr. Burrell was mentally ill and entered a written order directing BSO and ARMOR to screen Mr. Burrell for mental health. (Ex. 5 – Court order).

27. On March 2, 2016, BSO deputies alerted ARMOR LPN Carla Degand that Mr. Burrell was having psychiatric problems. LPN Degand found Mr. Burrell pacing around the

unit with a laundry bag over his shoulder and claiming that the other men in his unit were Colombian freedom fighters and they and Mr. Burrell had fought together. Based on her evaluation of Mr. Burrell, LPN Degand had Mr. Burrell transferred to the Closed Mental Health Unit in the North Broward Bureau (NBB) for psychiatric evaluation.

28. On March 3, 2016, Defendant MARTIN, an ARMOR employee, examined Mr. Burrell in the solitary cell of the mental health observation unit. Defendant MARTIN documented: Mr. Burrell had a long history of mood swings, was refusing any medication except for the Trileptal that he was currently taking and had been taking for years to manage his bipolar disorder. MARTIN discontinued the Trileptal because it was not on ARMOR's formulary. MARTIN diagnosed Mr. Burrell with bipolar disorder, discharged him for psychiatric observation and transferred him to general population with no medication for his serious mental health problems.

29. By March 11, 2016, Defendant KESSON examined Mr. Burrell and recognized that his mental health had significantly deteriorated. Defendant KESSON, an ARMOR employee, recorded in his medical chart that "Mr. Burrell was in a manic state and he loves it". At this point, Defendant KESSON knew from the prior entries in the medical records that Mr. Burrell was bipolar, had been hospitalized for his mental illness immediately before his arrest, was currently not taking any mental health medication and nine days ago had stated that he and his cellmates were all Columbian freedom fighters. Despite having this knowledge Defendant KESSON took no action to care for Mr. Burrell's serious mental health condition. He failed to contact any provider or offer any treatment. Instead, KESSON's documented plan in the medical record was that Mr. Burrell should remain in the Closed Mental Health Unit without out treatment.

30. The Closed Mental Health Unit in the Broward County jail is an area of the jail where

mentally ill inmates are warehoused indefinitely. Inmates in this unit are given one hour of out of cell time per day and are locked-down 23 hours a day in solitary confinement.

31. On March 15, 2016, Defendant KESSON again evaluated Mr. Burrell, and again he planned that Mr. Burrell should remain in the Closed Mental Health Unit. Defendant KESSON was aware that: Mr. Burrell suffered from a serious mental illness, that keeping a seriously mentally ill person in solitary confinement will cause them to deteriorate further, that Mr. Burrell was not medicated for his mental illness and that he was in a manic state just four days ago when Defendant KESSON had evaluated him. However, Defendant KESSON did nothing to treat Mr. Burrell or request that someone else examine and treat Mr. Burrell.

32. On March 21, 2016, Mr. Burrell was evaluated for competency to stand trial by Dr. Michael Brannon. During the evaluation Mr. Burrell stated that; he had earned a doctorate in psychology, a law degree, a degree in electrical engineering, served in Vietnam where he was exposed to Agent Orange, was hired from the private sector by the C.I.A., had been arrested for trafficking in cocaine and was currently divorced. However, none of that is true. Dr. Brannon interviewed several BSO corrections deputies who stated that Mr. Burrell was currently housed in a solitary lockdown cell due to his unusual behavior and threatening statements. The deputies also reported that Mr. Burrell had made several fantastical claims such as "owning the jail," "being a millionaire," and "working as a doctor." They also reported that Mr. Burrell was observed talking to himself on several occasions and pacing in his cell for several hours at a time. Based on several tests and the interviews with correctional staff Dr. Brannon found that Mr. Burrell was not Malingering and suffered from Bipolar I disorder with psychotic features and was not competent to stand trial. Dr. Brannon's conclusion was that Mr. Burrell:

> "meets the legal criteria for involuntary hospitalization, as he poses an imminent

> risk of danger to self and others at this time. The examinee would likely be restored to competency through stabilization of his mental condition on psychotropic medications in a secure psychiatric setting such as Fort Lauderdale Hospital. "(Attached 5-page report of Dr. Brannon as Ex. 6)

33. On March 25, 2016, Defendant KESSON again evaluated Mr. Burrell and knowing that Mr. Burrell was seriously mentally ill and not medicated, still his only plan of treatment was to leave Mr. Burrell in his solitary cell in the Closed Mental Health Unit.

34. On March 30, 2016, at 11:30 a.m., Defendant JUDITH JONES, an LPN employed by ARMOR examined Mr. Burrell. Defendant JONES documented that Mr. Burrell was complaining of severe abdominal pain and had critical vital signs consisting of a weak pulse and a blood oxygen saturation that had decreased to 88%. Defendant JONES also recorded that Mr. Burrell was incontinent of urine, his jail uniform was soaked with urine, he was disheveled, dirty and his gait was so unsteady that he was placed into a wheelchair to be moved to the infirmary. At this point, JONES was aware that Mr. Burrell was medically critical and needed emergency treatment at an outside hospital. However, Defendant JONES failed to have Mr. Burrell transferred to an outside hospital for care and treatment.

35. At 12:20 p.m. on March 30, 2016, Defendant, MIZRAHY a physician assistant employed by ARMOR evaluated Mr. Burrell. Defendant MIZRAHY recorded in his medical chart that Mr. Burrell was brought to her as an emergency patient. Mr. Burrell reported to her that he had drunk a lot of water, urinated in his bed eight times and was experiencing abdominal pain. Defendant MIZRAHY recorded that Mr. Burrell was wheelchair bound, disheveled, odiferous, unsteady, short of breath, wearing a blood and urine stained uniform, with a rapid heart rate and an elevated temperature. Defendant MIZRAHY knew that Mr. Burrell was critically ill and in need of a higher level of evaluation and care than the jail could provide. However, she failed to have Mr. Burrell sent to an outside hospital for care

or make any arrangements to diagnose the cause of Mr. Burrell's critical vital signs and acute abdomen.

36. Defendant FRANKOWITZ, an ARMOR employee, also evaluated Mr. Burrell on March 30, 2016 at 12:30 p.m. He found Mr. Burrell confined to a wheelchair in the same condition noted in the above paragraph. Mr. Burrell told Defendant FRANKOWITZ that he was working for the C.I.A. and that he was very anxious. FRANKOWITZ was aware of the documented prior critical vital signs, abdominal pain, and elevated temperature. Defendant FRANKOWITZ knew or should have known that this was a medical emergency and that Mr. Burrell could not be properly diagnosed or treated in the jail and was in need of emergency medical care. However, he failed to order any diagnostic procedures or have Mr. Burrell transferred to an outside hospital for diagnosis, care, and/or treatment.

37. Three hours later on March 30, 2016, Defendant PATRICIA RELL, an ARMOR employee and Defendant JONES were called to Mr. Burrell's cell by a BSO deputy. They found Mr. Burrell covered with fresh feces, urine, and vomit and curled in a fetal position. Per the medical records Mr. Burrell's blood pressure had fallen to a critically low level, and his pulse was extremely rapid. Mr. Burrell stated that his abdomen was painful and that he wanted to go to the fourth floor of the jail because he was wife was there and was waiting for him. Defendants JONES and RELL and the BSO deputy placed Mr. Burrell into his wheelchair and bathed him where they found feces caked up his back and a rash in his groin area. Per their reports, Mr. Burrell was wincing with pain when the washcloth touched his abdomen. These Defendants knew or should have known that this was a medical emergency and that without diagnosis and treatment in an outside hospital Mr. Burrell would die. Despite their knowledge that the jail infirmary couldn't provide the level of care he needed, the Defendants merely relocated Mr. Burrell the infirmary.

38. On March 31, 2016 at 1:10 a.m. Defendant MONICAL, an ARMOR nurse, evaluated Mr. Burrell in the infirmary. Defendant MONICAL documented that Mr. Burrell was confused, disoriented and his vital signs were still critical. He still had an altered mental state, and he thought it was 3 p.m., and he wanted to call his wife to come and get him. Defendant MONICAL, knowing that Mr. Burrell was medically critical and in need of emergency medical intervention failed to do anything. She did not contact a doctor, she did not examine his abdomen, she did not have him moved to the hospital where he could have received the treatment and care he required and that the jail infirmary could not provide. Her only plan was to continue to monitor Mr. Burrell.

39. At noon on March 31, 2016, Defendant FRANKOWITZ reviewed the laboratory results from Mr. Burrell's blood draw that was done the day before. Defendant FRANKOWITZ realized that the results were critically abnormal and showed that Mr. Burrell had a severe infection and dehydration. The lab results provided FRANKOWITZ objective evidence that Mr. Burrell was medically critical and would die without real medical intervention which could not be provided in the jail. Mr. Burrell's White Blood Count (WBC) was 16,800 indicating that his body was fighting an infection (normal WBC range is 3,600-11,000). Thirty percent of this elevated WBC was composed of Band Neutrophils. The normal range for these Band Neutrophils is 3% to 5% of the total WBC. An increase in Band Neutrophils typically means that the bone marrow has been signaled to release more WBCs. Most often this is due to an infection in the body. At this point, Defendant FRANKOWITZ had in addition to the lab results, the evidence from his evaluations of Mr. Burrell and all the documentation in the chart which confirmed that Mr. Burrell was dying and in need of hospitalization. FRANKOWITZ chose to neglect Mr. Burrell and leave him without any meaningful treatment. He did not examine his abdomen, did not order

emergency radiologic examinations or have Mr. transferred to an outside hospital for care and/or treatment.

40. On April 1, 2016, at 12:40 a.m., Defendant CYNTHIA MCDONALD, an ARMOR employee recorded in Mr. Burrell's medical chart that Mr. Burrell was disoriented and wanted to see his wife and that he thought that she was downstairs. Defendant MCDONALD examined Mr. Burrell's abdomen and found it to be tender, distended and with hypoactive sounds. Defendant MCDONALD documented that she found green vomit at Mr. Burrell's bedside and that he physically exhibited signs of severe dehydration. However, Defendant MCDONALD, like her colleagues failed to treat or diagnose Mr. Burrell's serious medical condition or have him transferred to an outside hospital.

41. On April 1, 2016, at 5:25 a.m., Defendant MARTIN, examined Mr. Burrell and found him to be psychotic and delusional. Defendant MARTIN, a medical doctor, realized based on Mr. Burrell's medical history and his current condition that this was a medical emergency. However, Defendant MARTIN failed to do anything address Mr. Burrell's serious medical condition and left him the solitary cell.

42. At 10:45 a.m. on April 1, 2016, Mr. Burrell was found unresponsive in his cell and was transported to North Broward Medical Center. Mr. Burrell arrived at the emergency room at 11:43 a.m. and was pronounced dead at 11:59 a.m.

43. An autopsy was conducted and the medical examiner concluded that Mr. Burrell died from "peritonitis secondary to bowel perforation".

44. Mr. Burrell died a slow, painful and preventable death from a common and treatable medical condition.

45. Based on ARMORS review of Mr. Burrell's death Defendant FRANKOWITZ was fired. ARMOR's policymakers concluded that Defendant FRANKOWITZ failed to send

Mr. Burrell to an outside hospital for care and treatment in medically appropriate manner. (Ex. 1 at pg. 4)

**EXAMPLES OF OTHER SIMILAR INMATE DEATHS IN THE BROWARD COUNTY JAIL THAT SHOW ARMOR'S HISTORY OF DELIBERATE INDIFFERENCE**

**William Campbell:**

46. On February 5, 2011, William Campbell was arrested for DUI. He was booked into the Broward County Jail and evaluated by ARMOR'S medical staff.

47. On February 6, 2011, at 10:00 A.M. William Campbell became hypotensive with a blood pressure of 63/37. Defendant FRANKOWITZ was contacted, made aware of this serious medical condition and failed to have Mr. Campbell transported to the hospital when hospitalization was necessary due to a medical emergency.

48. On February 6, 2011, at 4:00 P.M. William Campbell was found on the floor and incontinent of feces. Mr. Campbell was evaluated at this time by ARMOR employee Pat Janis and found to be still hypotensive with a blood pressure of 75/47, a fever of 102.5, a pulse of 106 with increasing ataxia (the loss of full control of bodily movements) and confusion.

49. On February 7, 2011, at 8:00 A.M. William Campbell was evaluated by Defendant FRANKOWITZ and transferred to the hospital where he later died.

50. An autopsy was conducted and the medical examiner concluded that "sepsis was a factor contributory to death."

51. On February 22, 2011, ARMOR drafted a three-page document called a "Mortality

or Morbidity Review." This review outlines the medical care that was provided and memorializes ARMOR'S conclusions regarding whether the medical care was appropriate. In the case of William Campbell, ARMOR concluded that the:

> "Patient's vital signs and conditions were deteriorating. He was in early shock with symptoms consistent with SIADH Na+119. IV fluid and p.o. antibiotics were not appropriate amount or route to arrest deterioration. **The decision to obtain a higher level of care was delayed at least 24 hours**."

52. The Mortality or Morbidity Review relating to William Campbell was reviewed at a meeting on February 23, 2011, that was attended by ARMOR'S regional vice president, Health Services Administrator, medical director and director of nursing as well as eight other high-ranking ARMOR employees. Therefore, ARMOR and BSO through their policymakers were aware of the problems outlined above in the care of William Campbell including that the decision to transfer him to an outside hospital was delayed at least 24 hours. However, ARMOR or BSO failed to take any corrective action to prevent future deaths. (Ex. 7 – Mortality Review for Mr. Campbell)

**Gary J. Smith:**

53. On August 4, 2011, Gary Smith was arrested for possession of cocaine and booked into the Broward County Jail. ARMOR though its employees discovered that Mr. Smith had full-blown AIDS with a CD4 of 136 and viral load of 300,000 (a CD4 count below 200 is recognized as the threshold level when a person who is HIV+ is considered to have AIDS and when HIV or AIDS is properly managed the viral load will be zero). However, no ARMOR employee made any attempt to place Mr. Smith on any antiretroviral medication that would have decreased his viral load and increased his CD4. As expected, Mr. Smith's health deteriorated and he was moved to the infirmary after an acute episode

of shortness of breath. Instead of transferring Mr. Smith to an outside hospital for care and treatment of his serious medical conditions, ARMOR kept Mr. Smith inside the jail infirmary where he became dehydrated and suffered from acute renal failure with metabolic encephalopathy.

54. On October 8, 2011, Gary Smith, while in the infirmary, became incontinent of urine and had persistent garbled speech. ARMOR'S medical personnel were aware of the medical history as outlined above but still ignored a clear medical emergency and failed to transport Mr. Smith to an outside hospital that could have provided the level of care that he needed.

55. On October 9, 2011, at 5 P.M. Gary Smith deteriorated to the point where he became unresponsive. Mr. Smith was transported to the hospital where he coded before he was admitted to the Intensive Care Unit. Hospital employees revived Mr. Smith and placed him on a ventilator. On October 10, 2011, Mr. Smith coded again and was not able to be revived. His time of death was 7:52 AM on October 10, 2011.

56. An autopsy was conducted and the cause of death was "acute lobar pneumonia with a clinical history of low CD4 count and acute renal failure and dehydration".

57. ARMOR drafted a "Mortality or Morbidity Review" after Mr. Smith's death. The review concluded that when Mr. Smith became dehydrated, a more aggressive rehydration treatment was necessary, but not provided. ARMOR'S regional vice president, medical director, director of nursing, BSO Captain Callaghan and nine other high-ranking ARMOR employees reviewed this report on January 11, 2012. Therefore, ARMOR and BSO were aware of the constitutional deficiencies in Mr. Smith's care. However, they failed to make

any changes to prevent this type of unnecessary death from recurring in the future. (Ex. 8 – Mortality Review of Mr. Smith).

58. Gary Smith's medical treatment was reviewed by Dr. Arthur Fournier, Professor Emeritus, Department of Internal Medicine at the University Of Miami School Of Medicine. Dr. Fournier found the care provided to Gary Smith and the decision not to have him transferred to an outside hospital before his death were actions grossly contrary to accepted medical practices.

**Calvin Goldsmith:**

59. On December 18, 2011, Calvin Goldsmith was arrested for trespassing and booked into the Broward County Jail.

60. On December 22, 2011, Calvin Goldsmith became critically ill and fell in his cell several times striking his head, causing several facial lacerations. ARMOR personnel moved Mr. Goldsmith to the infirmary where he became agitated and critically hypotensive (low blood pressure).

61. According to ARMOR'S medical records over the next few days Mr. Goldsmith continued to deteriorate, and on December 24, 2011, he was found in his cell, lying on the floor too weak to move and covered in feces. Defendant FRANKOWITZ was notified and apprised of the situation. Faced with this clear medical emergency of a man deteriorating and dying in their infirmary ARMOR through its employees, including Defendant FRANKOWITZ, failed to transfer Mr. Goldsmith to the hospital when it was necessary and obvious that he required emergency medical care.

62. On December 26, 2011, two days after Mr. Goldsmith was found lying on the floor

in his feces to weak and sick to move, he was reevaluated by ARMOR'S medical personnel and found to be moaning, gurgling, dehydrated and in shock. He was then transferred to the hospital where he died.

63. An autopsy was conducted and the medical examiner ruled the cause of death to be "sepsis due to perforated diverticula" just like Mr. Burrell.

64. ARMOR conducted a "Mortality or Morbidity Review" relating to the death of Calvin Goldsmith and concluded that Mr. Goldsmith was suffering from decreasing blood pressure, altered mental status, was moaning and that the provider (FRANKOWITZ) was aware of this and it appears that nothing was done. The medical care of Mr. Goldsmith and the "Mortality or Morbidity Review" was discussed at a meeting held on January 11, 2012 – the same day that the same group reviewed the "Mortality or Morbidity Review" for Gary Smith as outlined in paragraph 55 above. This meeting was attended by ARMOR'S regional vice president, medical director, director of nursing, health services administrator and five other high-ranking ARMOR employees. Therefore, ARMOR and BSO was aware of the constitutional deficiencies in the care of Mr. Goldsmith and even with this knowledge failed to make any changes that would prevent unnecessary deaths in the future. (Ex. 8 – Mortality Review for Mr. Goldsmith)

**Raleigh Priester:**

65. On February 6, 2012, Raleigh Priester, a United States Army veteran, who had battled severe mental health problems, including schizophrenia, for over two decades was arrested for throwing a rock at a City of Fort Lauderdale employee who had asked him to vacate a city parking garage. According to booking records from the Broward County Jail,

Mr. Priester was 6 foot 2 inches tall and weighed 240 pounds the day he was arrested.

66. From February 6, 2012 to May 22, 2012, Mr. Priester was locked in a single man cell, 24 hours a day, where the medical records show that he consistently urinated blood from an infection that was never treated, banged his head into the wall, paced naked for hours everyday and stood upright for so long that he developed ulcers on his feet. Defendants FRANKOWITZ, MARTIN, and KESSON were all aware of this and did nothing until May 22, 2012, when Mr. Priester was found unresponsive on the floor of his isolation cell.

67. On May 22, 2012, when Mr. Priester was transferred to the North Broward Medical Center (NBMC) he weighed 139 pounds, 101 pounds less than the day he was arrested. Mr. Priester was diagnosed as being hypotensive with a blood pressure of 94/40, malnourished, dehydrated, septic, and suffering from bilateral pneumonia. His treating physician stated his condition was extremely critical.

68. Realizing that Priester was gravely ill and malnourished the medical staff at NBMC consulted a dietitian who prescribed a high-calorie diet. By May 25, 2012, Priester, with proper nutrition, gained 11 pounds and his weight rose to 151 pounds

69. On May 29, 2012, Priester was discharged from NBMC back to the Broward County Jail with specific instructions to the jail regarding Priester's continuation of care for his diagnosed serious medical conditions.

70. From May 29 to June 25, 2012, Priester was returned to solitary confinement and employees of ISRAEL and ARMOR, including Defendants FRANKOWITZ and MARTIN, failed to provide him with any of the medication ordered by the hospital and

then they all stood by and watched as he slowly died. According to Mr. Priester's jail medical records during this time he was observed being agitated, non-verbal, talking to himself, urinating and defecating everywhere except the toilet and being in obvious medical crisis.

71. On July 10, 2012, Priester was found dead on the floor of his solitary confinement cell. **He weighed 120 pounds.** In 155 days Priester's weight had dropped from 240 pounds to 120 pounds.

72. The death of Raleigh Priester formed the basis of Case No. 14-61577-Civ-Bloom, a federal civil rights lawsuit filed in the Southern District of Florida which settled in the summer of 2015.

**Arthur Sacco:**

73. The horrible death of Mr. Sacco is almost identical to the death of Mr. Burrell. They both died slowly over a period of days from a similar abdominal infection. Mr. Sacco was housed in the infirmary of the North Broward Bureau (NBB) like Mr. Burrell and was a patient of Defendant FRANKOWITZ and many of the same the same ARMOR employees who let Mr. Burrell die.

74. On June 21, 2012 Mr. Sacco was brought to Memorial Regional Hospital as a Baker Act because he was intoxicated and had voiced a desire to end his own life. Sacco went through the withdrawal process without difficulty at the hospital. Once the hospital determined he was stable he was released to the police due to their bringing him in. Sacco was transported directly to the Broward County Jail where he was booked in on June 25, 2012.

75. On June 27, 2012 Defendant FRANKOWITZ met with Sacco, evaluated him and

conducted a history and physical. In his history and physical Defendant FRANKOWITZ recorded that Sacco was a 52-year-old white male with a mental health history including several past Baker Acts, a prior major spinal surgery and a gastric bypass surgery in 2008. Defendant FRANKOWITZ did not find any current physical ailments or current serious medical conditions during the examination on June 27, 2012.

76. On June 29, 2012, Defendant FRANKOWITZ again evaluated Sacco and this time he recorded that Sacco was vomiting, suffering from severe back pain and that his blood pressure had increased.

77. On July 4, 2012, at 7:15 A.M. ARMOR employee, Lashanta Rufus, LPN was contacted by a BSO Deputy and was told that Sacco was vomiting and had diarrhea. The Deputy reported that Sacco was too weak to hold himself up. ARMOR employee Rufus recorded that Sacco was dry heaving and had a constant flow of diarrhea. A BSO Sergeant ordered Sacco moved to the infirmary. Then, with the help of staff, Sacco was showered to remove the vomit and diarrhea and was put into a diaper.

78. On July 4, 2012, at 3:10 P.M. ARMOR employee LPN Saint-Louis documented that while she was distributing medication, Sacco was unable to stand without help. At this point, a BSO Deputy requested that ARMOR move Sacco to Unit 1F5, which is a medical placement for critically ill inmates, as soon as possible.

79. On July 4, 2012, at 9:30 P.M. ARMOR employee LPN Warner recorded in Sacco's medical chart that he was unable to stand on his own. Therefore, a mattress was placed on the floor, and because he was physically unable to change his diaper, his diaper was changed for him. At this point ARMOR medical personnel, including Defendant FRANKOWITZ, were aware that Sacco was critically ill and needed to be transported to the hospital. However, they failed to have him moved to a hospital or provide more

intensive treatment within the jail.

80. On July 5, 2012, at 1:00 PM, Sacco was again seen by Defendant FRANKOWITZ who recorded that the day before Sacco had been found by BSO Deputies in his cell covered in emesis (vomit) and diarrhea. Defendant FRANKOWITZ documented that Sacco was very frail, his tongue was dry, and he had poor skin turgor (a sign of severe dehydration). At this point Defendant, FRANKOWITZ knew that Sacco was critically ill and needed to be moved to an outside hospital for treatment. However, Defendant FRANKOWITZ deliberately ignored the clear signs of a medical emergency and failed to move Sacco to a hospital for treatment.

81. On July 5, 2012, at 1:45 P.M. Sacco was evaluated by ARMOR employee Sylvain LPN who found Sacco laying on a mat and only able to mumble a few words. She recorded that Sacco, still in a diaper, was so weak that he was unable to hold a cup or water or food to his mouth without assistance.

82. On July 5, 2012, at 4:30 P.M. Sacco was evaluated by ARMOR employee nurse Janis who found Sacco so severely ill that she was only able to arouse him with a deep sternum rub – (a deep sternum rub is what is used when an individual is unconscious and unable to be aroused by other methods). Nurse Janis recorded that Sacco was dehydrated and his skin was dry and warm. Defendant FRANKOWITZ was contacted and apprised of the situation. At this point Sacco had been in a diaper and unable to stand on his own for over 30 hours and his condition was rapidly deteriorating. However, Defendant FRANKOWITZ and the rest of ARMOR'S medical employees failed to transfer Sacco to the hospital.

83. On July 6, 2012, at 1:30 A.M. ARMOR employee Defendant MONICAL recorded that Sacco was medically critical and in a state of shock. She recorded in her notes that

Sacco was unresponsive and only opened his eyes slightly when she moved him so that she could take his vital signs. Defendant MONICAL was not able to take Sacco's temperature because Sacco was unable to close his mouth around the thermometer. There was no medical justification for failing to transport Sacco to a hospital where he could be properly treated for his serious medical conditions yet she failed to do so.

84. Through the early morning hours of July 6, 2012, Sacco was kept on IV fluids, and the amount was increased because he was not responding. He was dying and needed hospitalization.

85. On July 6, 2012, at 10:00 AM, Defendant FRANKOWITZ again saw Sacco. Defendant FRANKOWITZ recorded that Sacco could only be aroused with a sternum rub, that Sacco had been on an IV for 18 hours and was still medically critical.

86. Six hours later, on July 6, 2012, at 4:00 PM Defendant FRANKOWITZ recorded in Sacco's medical chart that the lab results showed that Sacco was in shock and that a medical emergency existed. The results as recorded by Defendant FRANKOWITZ showed that Sacco's blood urea nitrogen levels had increased from 13 mg/dL (normal) on June 26th to 108 mg/dL. This increase indicated life-threatening dehydration or kidney failure. Based on these findings Defendant FRANKOWITZ wrote in Sacco's medical chart that the labs confirmed that Sacco was severely dehydrated and his blood urea nitrogen was extremely high. Defendant FRANKOWITZ put a star next to the words "severe dehydration" in his handwritten notes. Defendant FRANKOWITZ then wrote that Sacco was already on an IV underlining the words, "already on an IV," indicating that he realized that the IV was not stabilizing Sacco. Defendant FRANKOWITZ also recorded that Sacco's white blood count (WBC) was 21,900 $mm^3$. A WBC of 11,000 $mm^3$ or higher suggests an acute bacterial infection. Sacco also had a fever of almost 101. The blood urea

nitrogen indicated a severe, life-threatening dehydration and the WBC and fever suggested that he had an infection. His clinical deterioration together with the laboratory results indicated infection plus dehydration and constituted a medical emergency that required immediate hospitalization. Still, Defendant FRANKOWITZ failed to have Sacco transported to the hospital.

87. On July 6, 2012, at 6:30 PM ARMOR employee nurse Janis inserted a Foley catheter into Sacco's penis. Sacco, according to Nurse Janis' notes, was not verbally responsive but moaned at times.

88. Then on July 6, 2012, at 11:00 PM a BSO Deputy was conducting a head count of inmates when he noticed Sacco was unresponsive in his cell. The Deputy contacted ARMOR employee Defendant MONICAL, who called ARMOR physician, Dr. Hoffman, who approved the transfer of Sacco to the hospital. Defendant MONICAL called EMS about two hours after she was contacted by the concerned Deputy. EMS arrived at 1:04 AM on July 7, 2012.

89. Based on Sacco's hospital records when he arrived in the emergency room he was quickly diagnosed as being in septic shock. A CT scan revealed a perforated bowel. As he was being prepped for surgery, he coded and was pronounced dead at 8:47 AM on July 7, 2012.

90. Sacco's death was preventable. He would not have died if ARMOR'S medical personnel, including Defendants FRANKOWITZ and MONICAL, and others had transported Mr. Sacco to the hospital without the medically unjustified delay.

91. An autopsy was conducted and the cause of death was identified as "sepsis due to a perforated diverticulum". Sacco's cause of death found at autopsy was identical to Mr. Burrell's cause of death found at autopsy. The doctor who did Sacco's autopsy found 900

milliliters of fecal material in Sacco's abdominal cavity, 100 milliliters of straw-colored fluid within the right pleural cavity and 200 milliliters of straw-colored fluid in the left pleural cavity.

92. After Sacco's death ARMOR completed a three-page "Mortality or Morbidity Review" that evaluated the care provided to Sacco by ARMOR and found that, Sacco was admitted to the infirmary on July 3, 2012, for vomiting, diarrhea, and severe dehydration. Sacco had an elevated WBC count and temperature of 100.8. ARMOR concluded that **"perhaps he [SACCO] could have been sent sooner to the hospital." (**Ex. 9 – Sacco Mortality Review)

93. The medical care of Sacco and the "Mortality or Morbidity Review" was discussed at meeting held on July 19, 2012. This meeting was attended by ARMOR'S medical director, regional vice president, director of nursing, health services administrator and five other high-ranking ARMOR employees. Therefore, ARMOR and BSO were aware of the constitutional deficiencies in the care of Sacco and even with this knowledge failed to make any changes that would prevent this type of unnecessary death in the future.

94. The death of Sacco is almost identical to the death of Mr. Burrell with the same symptoms, many of the same ARMOR employees and the same horrible, painful and preventable death.

95. All claims involving the death of Mr. Sacco were settled with the representation of the undersigned before a suit was filed in.

**William Herring, Jr.:**

96. The death of Mr. Herring forms the basis of a pending civil rights case in Southern District under case number 16-cv-62950.

97. William Herring, Jr. was a severely mentally ill 22-year-old who was arrested in Port Saint Lucie, FL for violating his Broward County mental health probation. He had left a treatment facility and was found sleeping on a bus bench. He spent several days in the Saint Lucie County jail where he was Baker Acted because he was refusing to eat and was identified as being severely mentally ill.

98. Mr. Herring arrived in the Broward County jail on October 26, 2012. At intake ARMOR received the paperwork from Saint Lucie County showing that Mr. Herring had not eaten anything for several days, was currently Baker Acted because he was a danger to himself and was severely mentally ill. Mr. Herring explained to the ARMOR medical provider that he fasting and would not eat, drink or take any medication because that is what God asked of him. Mr. Herring also disclosed that he was bipolar, not taking his medication and that he had recently been hospitalized for mental health reasons.

99. From October 26th to November 8, 2012, the ARMOR medical records show that Mr. Herring spent his days either rocking back and forth on his bunk naked or walking around his cell naked. Mr. Herring consistently refused food and liquids explaining that he was not suicidal but that he was not eating or drinking for religious reasons. Mr. Herring was seen many times by Defendants MARTIN, FRANKOWITZ, KESSON and other ARMOR employees who all filed to treat Mr. Herrings serious mental illness or the serious medical conditions caused by his fasting.

100. On November 2, 2012, Broward Circuit Court Judge Singhal entered an order directing ARMOR and BSO to immediately have Mr. Herring seen by the psychiatric staff to determine the need for medication. Judge Singhal wrote ASAP at the end of the order. This order was ignored by all the Defendants.

101. Late on November 8, 2012, Mr. Herring collapsed in the jail and was transported by

EMS to the emergency room at North Broward Medical Center (NBMC). On intake at the hospital, Mr. Herring's blood was drawn, and he was found to be severely dehydrated. The hospital started IV therapy to stabilize him. Also, Mr. Herring was seen by a psychiatrist who immediately identified Mr. Herring as severely mentally ill and in need of treatment. This psychiatrist quickly Baker Acted Mr. Herring and began to give him Haldol injections to treat his psychosis.

102. Mr. Herring remained in the hospital for six days while he was stabilized, his severe dehydration was treated with an IV, and his mental illness was treated with Haldol injections.

103. When Mr. Herring was discharged on November 13, 2012, the doctor at the hospital spoke to Defendant FRANKOWITZ and the BSO Deputy who was with Mr. Herring at the hospital and instructed them both that Mr. Herring should NOT be returned to the jail but instead brought to a psychiatric hospital for further care.

104. Defendant FRANKOWITZ, Defendant MARTIN, the BSO Deputy and the rest of ARMOR'S medical providers choose to ignore the explicit directions of the doctor who was treating Mr. Herring at the hospital. He was delivered back to the jail and although ARMOR'S records show that he was too weak to stand, they stripped him naked again, gave him a suicide vest to cover himself and locked him in a suicide cell alone. In addition to ignoring the directions to place Mr. Herring in a psychiatric hospital and not in the jail Defendants FRANKOWITZ, MARTIN and ARMOR's other medical providers also choose not follow the hospital's discharge instructions regarding medication for Mr. Herring. The hospital had discharged Mr. Herring on Haldol for his mental illness and ordered that he be treated for his mental illness. However, Defendant FRANKOWITZ, MARTIN and ARMOR'S other providers choose not to give him the Haldol as ordered or give him any medication for his mental illness.

105. On November 14, 2012, HERRING was examined by Defendant MARTIN who recorded that HERRING was lying naked on his bunk and had just been returned from the hospital where he was treated for severe dehydration. MARTIN documented that Mr. Herring was still refusing to eat or drink anything and that when he was in the hospital, he was given Haldol but that he is currently not being treated with Haldol in the jail. Defendant MARTIN'S plan, according to his notes, is that Mr. Herring will be going to court in two days and Defendant MARTIN is hoping that the Judge will Baker Act him at that point. Defendant MARTIN was aware of Mr. Herring's serious medical conditions and that Mr. Herring is in need of treatment and should be transferred to an outside hospital. However, Defendant MARTIN took no steps to provide any care or have Mr. Herring transferred to an outside hospital that could provide the level of care that he needed.

106. On November 14, 2012, Mr. Herring was examined by Defendant FRANKOWITZ. Based on Defendant FRANKOWITZ'S own notes he was aware that: Mr. Herring is currently not eating or drinking; that he was just released from the hospital after a six-day stay; that he was in the hospital because he had become critically dehydrated from not eating or drinking; that the discharge instructions were to have Mr. Herring moved to a psychiatric hospital and to continue him on his previously ordered Haldol. However, Defendant FRANKOWITZ did nothing. He allowed Mr. Herring to remain acutely psychotic, unmedicated and not taking in fluids knowing that not treating this serious medical condition would result in Mr. Herring's death.

107. On November 15, 2012, Defendant MARTIN again examined Mr. Herring, he documented that he was lying on his bunk; he would not respond to his questions; he was still refusing his meals and was responding to internal stimuli – meaning that Mr. Herring

was hallucinating. Defendant MARTIN wrote in the medical chart that his treatment plan is that since Mr. Herring is going to court tomorrow that, "perhaps the Judge will Baker Act him to a facility where he can be treated medically and psychiatrically." However, Defendant MARTIN, a doctor who can order that Mr. Herring be medicated, that he be immediately Baker Acted, or immediately transferred to a facility that can care for him failed to do anything and allowed Mr. Herring to suffer and become more dehydrated.

108. On November 16, 2012, at about five in the morning, Defendant MARTIN again examined Mr. Herring and found him lying naked on the bunk and not responding to his questions. Again Defendant MARTIN failed to act even knowing that in past 24 hours since he last saw him, Mr. Herring had not moved from his bunk and had not consumed any food or water.

109. On November 16, 2012, HERRING collapsed when he was being transported to court. Mr. Herring was transported to Broward General Medical Center where he was found to be severely dehydrated and was exhibiting almost no brain activity.

110. For the next five weeks, Mr. Herring's mother and father sat by the bedside of their 22-year-old son as he struggled for his life on a ventilator.

111. After five weeks of sitting with their child day and night Mr. Herring's mother and father, based on the doctor's advice, decide to remove the life support and see if Mr. Herring could survive on his own. Mr. Herring did not survive and on December 22, 2012, William Herring, Jr. died. His parents donated his organs.

112. The Broward County Medical Examiner conducted an autopsy and concluded that Mr. Herring's death was caused by "complications of an electrolyte imbalance due to prolonged fasting and the contributing cause was mental illness".

113. After Mr. Herring's death ARMOR and BSO conducted no investigation and

therefore, ARMOR ratified the unconstitutional conduct of its employees and BSO ratified the unconstitutional conduct of ARMOR.

**Simon Valacheryil**

114. On November 11, 2015 66-year-old Simon Valacheryil was arrested and booked into the jail.

115. He was housed in the mental health unit of the North Broward Bureau until January 3, 2015, when he was transferred to the infirmary and placed under the direct care of Defendant FRANKOWITZ. At this point, Mr. Valacheryil was described as weak, frail and unable to get out of bed. He was placed into an adult diaper. Defendant FRANKOWITZ reviewed the results from Mr. Valacheryil's blood tests that all showed that he was critically dehydrated and suffering from an acute and severe infection. Defendant FRANKOWITZ and all of ARMOR's other employees failed to have Mr. Valacheryil transferred to an outside hospital for care despite their knowledge that Mr. Valacheryil was in need of hospital-level care.

116. From January 3rd to January 7, 2015 Mr. Valacheryil's health continued to deteriorate as shown by his physical state, increasingly critical lab results and the blood in his stool. All indications were that he was dying, but again, Defendant FRANKOWITZ and ARMOR's other employees failed to have Mr. Valacheryil transferred to an outside hospital.

117. Finally, in the early morning hours of January 7, 2015, Mr. Valacheryil was sent to the hospital. However, at this point, because of Mr. Valacheryil's moribund state, there was nothing the hospital could do, and Mr. Valacheryil died at 5:52 AM on January 7,

2015.

118. When the Emergency Room received Mr. Valacheryil, they diagnosed him with a gastrointestinal bleed, pancreatitis, renal insufficiency, and sepsis. At autopsy, the Broward County Medical Examiner ruled that the cause of death was a gastrointestinal bleed and infectious pericarditis.

**Stephen Obremski**

119. On March 22, 2016, Stephen Obremski was arrested for DUI. Mr. Obremski had a long history of mental illness and was in a motorcycle accident a decade prior that left him with a left lower leg amputation and brain injury which rendered him totally disabled. Because of the leg amputation Mr. Obremski could not walk without the use of churches. At the time of his arrest he was married with two minor children. His youngest child is autistic.

120. From March 23 to April 4, 2016, Mr. Obremski was left lying face down in an isolation cell without crutches. On several occasions Mr. Obremski requested crutches due to having an amputated leg but according to the medical records he was never provided with crutches.

121. On March 23, 2016, Mr. Obremski was moved to the NBB and placed into an isolation cell just feet away from Mr. Burrell. At this time he was first seen by Defendant FRANKOWITZ who found most of his vital signs to be within normal limits.

122. On March 24, 2016, Mr. Obremski was seen by Defendants FRANKOWITZ and MONICAL who recorded that he was very confused and hallucinating.

123. On March 25, 2016, Defendant FRANKOWITZ examined Mr. Obremski after he

was found lying face down on the floor of his isolation cell having a seizure. According to the medical records his respirations were labored, there was blood on the floor, and on Mr. Obremski's hands and face, he also had a rash on his abdomen and buttocks.

124. Defendant FRANKOWITZ examined Mr. Obremski on March 30, 2016, in the same solitary confinement cell he had been in for a week and found him with critically low blood pressure and concluded that based on Mr. Obremski's lab results he was critically dehydrated. However, Defendant FRANKOWITZ failed to diagnose was what causing these serious medical conditions, treat the conditions or transfer Mr. Obremski to an outside hospital for care or treatment.

125. On March 30, 2016 just hours after being seen by FRANKOWITZ, Mr. Obremski was found lying on the floor unable to sit up and with a loose dark stool all over his torso. When he was cleaned off Nurse Mowatt noted redness and swelling on his knee, wounds on his chest and multiple patches of discoloration on his torso. Nurse Mowatt had his cell cleaned and placed Mr. Obremski in a diaper and returned him to his solitary confinement cell. What Nurse Mowatt observed is medical emergency because a dark stool indicates that Mr. Obremski was bleeding internally, similar to Ms. Farrah (¶130-135) and Mr. Valacheryil (¶112-116). The history of dehydration and low blood pressure confirms this diagnosis however Nurse Mowatt ignored Mr. Obremski's serious medical condition and did not notify a doctor or have him transferred to an outside hospital for care, diagnosis or treatment.

126. On March 31, 2016, Defendant MONICAL examined Mr. Obremski and found him still in acute distress, still without crutches and laying on the floor with his diaper falling

off. However, Defendant MONICAL ignored Mr. Obremski's serious medical condition and did not notify a doctor or have him transferred to an outside hospital for care, diagnosis or treatment.

127. Defendant FRANKOWITZ examined Mr. Obremski on April 1, 2016 (four hours after Mr. Burrell collapsed in his cell and was sent to the hospital). Defendant FRANKOWITZ recorded that Mr. Obremski had an infected right knee and according to new blood work had become more dehydrated since Defendant FRANKOWITZ saw him 48 hours prior. FRANKOWITZ recorded that Mr. Obremski was becoming volume depleted ( a condition that can result in death if not treated) but he did not send him the hospital or attempt to diagnose or treat what was causing these serious medical conditions.

128. From April 1 to April 4, 2016, Mr. Obremski was left in the solitary confinement cell without crutches unable to move himself from the mat on the floor. ARMOR's employees watched his blood pressure plummet, the wounds on his arms, legs and torso become more infected until 10 p.m. on April 4, 2016 when Mr. Obremski was transported to the hospital where he died from the internal bleeding that had begun on March 30th.

129. An autopsy was performed and the medical examiner concluded that Mr. Obremski died from a gastrointestinal hemorrhage. This is a treatable medical condition that would have been diagnosed and treated if Mr. Obremski had been transferred to an outside hospital without an unnecessary delay.

130. After the death of Mr. Obremski Defendant ARMOR conducted an investigation and concluded that Mr. Burrell, Mr. Obremski, and Ms. Farrah all should have been sent to the hospital and not kept in the infirmary. Defendant FRANKOWITZ was fired after this

investigation, but neither ARMOR nor BSO took any other remedial action to reduce the chances that this type of death would not occur again. (Ex. 1 at page 4).

**April Farrah**

131. On May 14, 2016, April Farrah was arrested for possessing an open container of beer. Ms. Farrah had a long history of mental illness.

132. At 6 p.m. on May 14, 2016, ARMOR employees identified that Ms. Farrah was seriously ill and they placed her in the infirmary of NBB where she was under the care of Defendants FRANKOWITZ, MCDONALD, MARTIN, MONICAL, and MIZRAHY. From this point on Ms. Farrah was in an isolation cell.

133. Ms. Farrah's health continued to deteriorate until May 18, 2016, at 6:03 a.m., when jail records show that Ms. Farrah had a catastrophic gastrointestinal bleed. According to the BSO records, she defecated blood all over her cell in such a substantial quantity that BSO employees contacted a Hazmat team to enter the jail and clean the cell. ARMOR nurse Mills observed and documented the medical emergency and did nothing. Ms. Farrah was not transferred to an outside hospital for diagnosis or treatment and was instead placed into a clean isolation cell.

134. For the next day and night, Ms. Farrah was kept in the isolation cell in the infirmary and was in contact with several ARMOR employees who all ignored her serious medical condition and allowed her to deteriorate until she collapsed and EMS was called on May 19, 2016.

135. Ms. Farrah died at the hospital on May 19, 2016, and the Broward County Medical Examiner concluded that she died of a "gastrointestinal hemorrhage".

136. After the death of Ms. Farrah Defendant ARMOR conducted an investigation and concluded that Mr. Burrell, Mr. Obremski, and Ms. Farrah all should have been sent to the hospital and not kept in the infirmary. Defendant FRANKOWITZ was fired after this investigation, but ARMOR or BSO did not take any other remedial action to reduce the chances that this type of death would not occur again. (Ex. 1 at page 4).

**<u>The Consent Decree</u>**

137. Broward Sheriff's Office and the Plaintiffs in the Carruthers class action entered into the Stipulation for Entry of Consent Decree on July 27, 1994 (the "Consent Decree"), which was then ratified and confirmed by Judge Hoeveler on January 31, 1995. On June 7, 1995, Judge Hoeveler issued an amended Order incorporating the settlement agreement of the parties. (Case 76-cv-06086-DMM).

138. The Consent Decree acknowledged that conditions of confinement had been determined to be unconstitutional and provided that all Broward County correctional facilities would be operated and maintained, at a minimum, by applying the most stringent provisions of applicable Federal and Florida law and the standards set forth in Chapter 33-8 of the Florida Administrative Code, the American Correctional Association Standards for Adult Local Detention Facilities, and the National Commission on Correctional Healthcare Standards of medical, dental and mental health services. Consent Decree at pg. 2, ¶ 4; pg. 4, at ¶ 10.

139. The Consent Decree requires BSO to provide mental healthcare consistent with "applicable Federal law" and with the Florida Administrative Code, and the standards from the National Commission of Correctional Healthcare (NCCHC). The Due Process Clause requires BSO to adequately and timely treat pretrial detainees' serious mental health

conditions.

140. During his tenure, the Court's mental health expert Dr. Metzner documented a series of systemic problems in the Broward Jail's mental healthcare system, particularly its failure to treat the acutely and chronically mentally ill. *See, e.g.*, Metzner IV at 17, 31, 36-38, 41-42 (noting ongoing problems with the initiation of psychotropic medications after admission, the mental health sick call process, access problems to psychiatric hospitalization, untimely provider involvement for actively psychotic prisoners, and inadequate treatment for prisoners refusing medications.)

141. The consent decree is still in force and applies to all DEFENDANTS who are named in this lawsuit, the above-listed failures have never been corrected although the DEFENDANTS have been aware of the problems for over a decade.

142. The DEFENDANTS had/have a duty to ensure that reasonable measures were taken to provide for the safety of inmates at the Broward County Jail facility.

143. DEFENDANTS were on notice of the unconstitutional conditions in the Broward County Jail facilities, and the problems found by Dr. Metzner when he examined the jails as part of the Consent decree and each failed to rectify these conditions.

144. The above acts and omissions of the DEFENDANTS constitutes a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Mr. Burrell and those similarly situated, resulting in the deprivation of his/their constitutional rights.

145. Federal and state law, as well as accepted corrections and medical practices at the time of the incident, provided "fair warning" to DEFENDANTS that their conduct was improper, incompetent, illegal and in violation of Mr. Burrell's constitutional rights.

146. The acts and omissions of the DEFENDANTS, as set forth above, violated established and well settled Federal constitutional rights of Mr. Burrell, i.e., due process of law under the Fourteenth Amendment, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

147. As a direct and proximate result of the acts and omissions of the DEFENDANTS as set forth above, Mr. Burrell suffered the following injuries and damages:

a. Violation of his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution;

b. Loss of his life.

**COUNT 1: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES, INC**

148. The Plaintiff realleges paragraphs 1-4, 6, 7, 9-147.

149. Since 2004 ARMOR has collected about $325,000,000 of taxpayer money from Defendant ISRAEL and the people of Broward County to provide comprehensive healthcare (including constitutionally required healthcare) to all inmates in the Broward County Jail system which is operated and supervised by ISRAEL.

150. During this period ARMOR was aware through its own record keeping that its employees had been deliberately indifferent to the serious medical conditions of hundreds of inmates and continued to be deliberately indifferent to the serious medical conditions of inmates. This deliberate indifference caused the deaths of the inmates listed above and exposed hundreds of other inmates to unnecessary pain and suffering since 2004.

151. ARMOR, with knowledge of these prior horrible and preventable deaths and many other poor health outcomes caused by their employees' deliberate indifference to the

serious medical conditions of pretrial detainees, failed to remedy the longstanding custom of medical neglect, diliberate indifference and the failure to send critically ill individuals to outside hospitals without any medically unjustified delay and therefore made it foreseeable and inevitable that others, such as Mr. Burrell, would be harmed and die.

152. Defendant ARMOR had a duty to train, supervise, control or otherwise ensure that the doctors and nurses under its control, including, but not limited to, the named DEFENDANTS in this case, did not violate the constitutional rights of persons such as Mr. Burrell.

153. At all times material hereto, Defendant ARMOR was responsible for adopting and implementing the rules and regulations regarding hiring, screening, training, supervising, controlling, disciplining and assigning their medical employees to their duties prescribed by the contract they entered into with Defendant ISRAEL.

154. ARMOR failed to comply with these obligations, as its employees, including the named DEFENDANTS in this case and others, breached their duties by failing to, assess, monitor, medicate, hydrate, diagnosis, treat Mr. Burrell and have him transferred to an outside hospital without any medically unjustified delay.

155. Defendant ARMOR failed to properly train and supervise its medical employees in the screening, assessment, treatment, care, and monitoring and supervision of inmates. ARMOR's employees demonstrated deliberate indifference to the health and well-being of inmates such as Mr. Burrell, by failing to conduct appropriate health screening, assessments, treatment, care, monitoring, medication, supervision, and transfer to local hospitals without any medically unjustified delay. Said failures resulted in Mr. Burrell

suffering and death.

156. Defendant ARMOR, through its employees, has exhibited its deliberate indifference to unconstitutional and/or negligent medical care that has resulted in the horrible and preventable deaths of the individuals listed in the complaint as well as others. ARMOR has maintained a system of review of the treatment of inmates which has failed to identify the improper treatment by the medical employees. ARMOR's system of review has failed to subject those who are deliberately indifferent or negligent to appropriate discipline, supervision, dismissal and/or retraining, to the extent that it has become the de facto policy and custom of ARMOR to tolerate the improper medical treatment of detainees within the Broward County Jail System.

157. Defendant ARMOR, a for-profit company, has intentionally engaged in a practice of not sending inmates to outside medical providers for treatment even when it is medically necessary because the cost doing so decreases ARMOR's profits. Mr. Burrell required hospital level healthcare, and because he did not get it, he suffered and died.

158. Defendant ARMOR has a policy and/or custom of not sending mentally ill inmates to an outside hospital for mental healthcare although ARMOR is aware that some mentally ill inmates require hospital-level care that cannot be provided inside the jail. Mr. Burrell required hospital level mental healthcare, and because he did not get it, he suffered and died.

159. Defendant ARMOR has a custom or policy that fails to address the serious problems that arise when inmates refuse treatment and/or medication. ARMOR has a custom or policy which fails to address how to provide inmates the treatment they need

when they are unable or unwilling to consent to treatment and/or medication due to a mental illness. Since ARMOR's custom/policy does not address these situations people suffer harm by not having the medication or treatment which they require to address their serious mental health or serious medical conditions.

160. Once Defendant MARTIN discontinued Mr. Burrell's prescribed mental health medications because they were not on ARMOR'S formulary Mr. Burrell refused to take any medication. For Mr. Burrell, mental health medication is vital for life, and without it, he suffered and died.

161. Defendant ARMOR has adopted written policies and unwritten customs that are deliberately indifferent to the needs of mentally ill inmates which have caused many inmates to go without needed medication. The result of allowing severely mentally ill inmates to go without necessary mental health medication is that they suffer unnecessary harm. Mr. Burrell was allowed to go without medication to treat his serious mental health problems, and as a result, he suffered and died.

162. Defendant ARMOR has acted with deliberate indifference to the needs of the inmates in Broward by failing to implement any policy or custom that would address the needs of unmedicated mentally ill inmates, inmates who refuse medication for their mental illness and inmates who are in need of outside hospitalization for mental health reasons.

163. Defendant ARMOR, with the authority of State law, acted in reckless disregard of both constitutional prohibitions and guarantees under color of state law, thereby misusing the power they possessed.

164. Mr. Burrell has been a victim of the above-mentioned illegal treatment of detainees

and said illegal treatment was the direct result of the previously described acts, omissions, policies or customs of ARMOR.

165. The deliberate indifference of ARMOR violated the constitutional rights of Mr. Burrell for which 42 U.S.C. § 1983 provides a remedy.

166. Mr. Burrell suffered a horrible, painful and preventable death as a result of ARMOR'S actions.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 2: 42 U.S.C. § 1983 CLAIM AGAINST DEFENDANT ISRAEL**

167. The Plaintiffs reallege paragraphs 1-4, 6, 7, 9-147.

168. Defendant ISRAEL, as the Chief Correctional Officer, appointed by the Broward County Board of County Commissioners, had a duty to train, supervise, control and otherwise ensure that Defendant ARMOR and ARMOR’S employees, including, but not limited to the ARMOR employees named in this complaint did not violate the constitutional rights of persons such as Mr. Burrell. Said Defendant abdicated his policymaking and oversight responsibilities, thereby allowing and making foreseeable the incident involving Mr. Burrell to occur.

169. Defendant ISRAEL, knew or should have known: (1) of the ARMOR reports demonstrating a failure of both corrections and medical staff to properly assess and treat inmate's serious medical conditions and to have them transferred to outside hospitals when

it was clearly medically necessary; (2) of preventable poor health outcomes of inmates and deaths that resulted from improper treatment and neglect; (3) that investigations into incidents of inmate neglect and poor medical outcomes including death were incompetent and failed to address the misconduct of the ARMOR employees and/or corrections officers; (4) that ARMOR has failed to correct the problems identified in the consent decree; (5) that ARMOR has a custom or policy of not sending mentally ill inmates to a facility that can provide them with the hospital level of mental healthcare that they require; (6) that ARMOR has a custom or policy that leaves individuals without needed medication or treatment because it fails to address the serious problems that arise when inmates refuse treatment or medication and also fails to address how to provide inmates the treatment they need when they are unable or unwilling to consent to treatment and/or medication due to a mental illness; (7) that ARMOR's employees have a custom of providing negligent medical care and acting with deliberate indifference to the serious medical needs of inmates which results in deaths and preventable poor health outcomes; (8) that by 2016 ARMOR had developed a long history of providing unconstitutional and negligent healthcare across the country and they required robust supervision in Broward County or not have their contract renewed every year by Defendant ISRAEL. Defendant ISRAEL was deliberately indifferent to the unreasonable risk he was exposing Broward County inmates to when he failed to remedy any of the above problems with the foreseeable result being the creation of circumstances that resulted in the neglect and death of Mr. Burrell.

170. Defendant ISRAEL, because he renewed the contract with ARMOR in 2017 and had not terminated the contract with ARMOR as of the date of filing this complaint has exhibited his continued deliberate indifference to the unconstitutional and negligent

medical care provided by ARMOR.

171. At all times material hereto, Defendant ISRAEL was responsible for adopting and implementing rules and regulations about assessment, medical treatment, housing, and monitoring of detainees.

172. Said Defendant was deliberately indifferent to his duties in that he either expressly or impliedly acknowledged and assented to the failure to train, supervise, control or otherwise screen employees and contractors of BSO including Defendants ARMOR and the ARMOR's employees named in this complaint and other ARMOR employees for, lack of training and/or skill or other characteristics making said medical providers and employees unfit to perform their duties at the Broward County Jail facilities.

173. Defendant ISRAEL was aware of the problems and conditions existing in the Broward County Jail System, such as the horrible and preventable deaths listed in this complaint and other deaths and injuries that resulted from inadequate manpower, poor monitoring, improper medical classification, improper medical screening, improper medical assessment, unacceptable medical care of inmates, including failing to send critically ill inmates to outside hospitals without any medically unjustified delay.

174. Defendant ISRAEL was deliberately indifferent to the safety of the inmates by failing to remedy these problems, even though he had notice of them.

175. Defendant ISRAEL'S deliberate indifference to these problems caused a substantial risk of harm to the Plaintiff and other inmates housed in Broward County Jail facilities.

176. The Defendant ISRAEL has maintained a system of review of the treatment and care of detainees, and complaints thereof, which has failed to identify the improper treatment and neglect by his officers and/or ARMOR and its employees who fail to

properly classify, monitor, treat, assess, medicate, protect, and house detainees to appropriate discipline, supervision, dismissal and/or retraining, to the extent that it has become a de facto policy and custom of Defendant ISRAEL to tolerate the improper treatment and neglect of physically and mentally ill detainees such as Mr. Burrell.

177. The foregoing acts, omissions, policies or customs of Defendant ISRAEL caused deputies and/or corrections officers and/or agents and/or employees and ARMOR and ARMOR's employees to believe there exists no meaningful duty to properly classify, monitor, treat, assess, medicate, protect, house or send detainees to an outside hospital for care, with the foreseeable result that deputies and/or corrections officers and/or agents and/or employees and ARMOR and ARMOR's employees are likely to ignore the needs of the ill detainees and endanger the safety and lives of inmates such as Mr. Burrell, thereby risking their safety and life.

178. The deliberate indifference of ISRAEL violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

179. The above acts and omissions of ISRAEL constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety, and welfare of Mr. Burrell and those similarly situated, resulting in the deprivation of the

Mr. Burrell's constitutional rights.

180. Mr. Burrell has been a victim of the above-mentioned illegal treatment of detainees and said illegal treatment was the direct result of the previously described acts, omissions, policies or customs of Defendant ISRAEL.

181. As a direct and proximate cause of the acts described above, Mr. Burrell died a

preventable and horrible death.

**WHEREFORE**, PLAINTIFFS demand compensatory damages against Defendant ISRAEL, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 3: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT FRANKOWITZ**

182. The Plaintiffs reallege paragraphs 1-4, 7, 9-13, 21-147.

183. At all times material hereto Defendant FRANKOWITZ, was employed by ARMOR as doctor and was Mr. Burrell's primary doctor was responsible for the medical and mental healthcare provided to Mr. Burrell. This medical and mental healthcare included monitoring, diagnosis and treatment of Mr. Burrell's serious medical and mental health conditions. The transferring Mr. Burrell to a hospital for both mental and physical health problems when it became apparent that he was in urgent need of hospitalization were included in the responsibilities of FRANKOWITZ.

184. Defendant FRANKOWITZ was acting under color of state law as an employee of Defendant ARMOR when he subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

185. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical and mental healthcare and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

186. Based on ARMOR'S records and reports regarding the deaths of the inmates listed in this complaint and others, Defendant FRANKOWITZ was on notice that prior inmates

under his and ARMOR's care had died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

187. FRANKOWITZ breached the duty of care that he owed to Mr. Burrell by failing to assess, medicate, treat, and monitor and have Mr. Burrell sent to a hospital for care, despite his notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

188. The deliberate indifference of FRANKOWITZ violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

189. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by Defendant FRANKOWITZ, Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant FRANKOWITZ, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 4: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MARTIN**

190. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 14 and 21-147.

191. At all times material hereto Defendant MARTIN was employed by ARMOR as doctor, specifically as psychiatrist, and was Mr. Burrell's primary doctor responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell as his health deteriorated, diagnosing and treating Mr. Burrell's serious mental health and medical conditions and transferring Mr. Burrell to a

hospital to treat his mental health and serious medical conditions when it became apparent that Mr. Burrell was in urgent need of hospitalization.

192. Defendant MARTIN was acting under color of state law as an employee of Defendant ARMOR when he subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

193. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

194. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others, MARTIN was on notice that prior inmates in his and ARMOR's care had died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

195. MARTING breached the duty of care that he owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite his notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

196. The deliberate indifference of this Defendant violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

197. As a direct and proximate result of the violation of Mr. Burrell's constitutional

rights by Defendant MARTIN Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MARTIN, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 5: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT KESSON**

198. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 15, 21-147.

199. At all times material hereto, the Defendant KESSON was employed by ARMOR and or BSO as a mental health and medical employee. KESSON had several contacts with Mr. Burrell and was responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell, diagnosing and treating Mr. Burrell's serious mental health and medical conditions, referring Mr. Burrell to another ARMOR provider for care and treatment and transferring Mr. Burrell to a hospital to treat his mental health and serious medical conditions when it became apparent that Mr. Burrell was in urgent need of hospitalization.

200. Defendant KESSON was acting under color of state law as an employee of ARMOR when he subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

201. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of KESSON's deliberate indifference to his obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

202. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others KESSON was on notice that prior inmates in his and

ARMOR's care died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

203. KESSON breached the duty of care that he owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite his notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

204. The deliberate indifference of KESSON violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

205. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by KESSON Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant KESSON, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 6: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MIZRAHY**

206. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 16, 21-147.

207. At all times material hereto MIZRAHY was employed by ARMOR as a physician's assistant and was responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell as his health deteriorated, diagnosing and treating Mr. Burrell's serious mental health and medical conditions and transferring Mr. Burrell to a hospital to treat his mental health and serious medical conditions when it became apparent that Mr. Burrell was in urgent need of hospitalization.

208. MIZRAHY was acting under color of state law as an employee of ARMOR when she subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

209. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of MIZRAHY's deliberate indifference to her obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

210. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others, MIZRAHY was on notice that prior inmates in her and ARMOR's care had died as a result of the deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

211. MIZRAHY breached the duty of care that she owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite her notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

212. The deliberate indifference of MIZRAHY violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

213. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by MIZRAHY Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MIZRAHY, attorney fees, costs, and trial by jury for all issues so triable by

right.

**COUNT 7: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MONICAL**

214. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 17, 21-147.

215. At all times material hereto Defendant MONICAL was employed by ARMOR as a nurse and was responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell as his health deteriorated, diagnosing and treating Mr. Burrell's serious mental health and medical conditions and transferring Mr. Burrell to a hospital to treat his mental health and serious medical conditions when it became clear that Mr. Burrell was in urgent need of hospitalization

216. MONICAL was acting under color of state law as an employee of ARMOR when she subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

217. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of MONICAL's deliberate indifference to her obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

218. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others MONICAL was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

219. MONICAL breached the duty of care that she owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite her notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

220. The deliberate indifference of MONICAL violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

221. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by MONICAL Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MONICAL, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 8: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT JONES**

222. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 18, 21-147.

223. At all times material hereto JONES was employed by ARMOR as LPN and was responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell as his health deteriorated, diagnosing and treating Mr. Burrell's serious mental health and medical conditions and transferring Mr. Burrell to a hospital to treat his mental health and serious medical conditions when it became clear that Mr. Burrell was in urgent need of hospitalization.

224. JONES was acting under color of state law as an employee of ARMOR when she subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

225. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of JONES' deliberate indifference to her obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

226. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others JONES was on notice that prior inmates under her and ARMOR'S ARMOR's care had died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

227. JONES breached the duty of care that she owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite her notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

228. The deliberate indifference of JONES violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

229. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by JONES Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant JONES, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 9: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MCDONALD**

231. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 19, 21-147.

230. At all times material hereto MCDONALD was employed by ARMOR as a nurse and was responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell as his health deteriorated, diagnosing and treating Mr. Burrell's serious mental health and medical conditions and transferring Mr. Burrell to a hospital to treat his mental health and serious medical conditions when it became clear that Mr. Burrell was in urgent need of hospitalization.

231. MCDONALD was acting under color of state law as an employee of ARMOR when she subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

232. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of MCDONALD's deliberate indifference to her obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

233. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others Defendant MCDONALD was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

234. MCDONALD breached the duty of care that she owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite her notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

235. The deliberate indifference of MCDONALD violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

236. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by MCDONALD Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant MCDONALD, attorney fees, costs, and trial by jury for all issues so triable by right.

**COUNT 10: 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT RELL**

238. The Plaintiffs reallege paragraphs 1-4, 7, 9, 10-12, 20-147.

239. At all times material hereto RELL was employed by ARMOR as an LPN and was responsible for the mental health and medical care provided to Mr. Burrell. This mental health and medical care included monitoring Mr. Burrell as his health deteriorated, diagnosing and treating Mr. Burrell's serious mental health and medical conditions and transferring Mr. Burrell to a hospital to treat his mental health and serious medical conditions when it became clear that Mr. Burrell was in urgent need of hospitalization.

240. Defendant RELL was acting under color of state law as an employee of ARMOR when she subjected Mr. Burrell to the deprivation of rights and privileges secured to him under the Eighth and Fourteenth Amendments to the United States Constitution.

241. The slow and preventable death of Mr. Burrell was a reasonably foreseeable consequence of this RELL's deliberate indifference to her obligation to provide appropriate mental health and medical care and to transfer Mr. Burrell to the hospital without any medically unjustified delay.

242. Based on ARMOR'S records and reports regarding the deaths of the individuals listed in this complaint and others Defendant RELL was on notice that prior inmates under her and ARMOR's care had died as a result of deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

243. RELL breached the duty of care that she owed to Mr. Burrell by failing to assess, medicate, treat, monitor and have Mr. Burrell sent to a hospital for care, despite her notice and knowledge of Mr. Burrell's serious mental health and medical conditions and need of hospitalization.

244. The deliberate indifference of RELL violated the constitutional rights of Mr. Burrell for which 42 U.S.C. §1983 provides a remedy.

245. As a direct and proximate result of the violation of Mr. Burrell's constitutional rights by RELL Mr. Burrell suffered a horrible and preventable death.

**WHEREFORE**, PLAINTIFFS demand compensatory and punitive damages against Defendant RELL, attorney fees, costs, and trial by jury for all issues so triable by right.

**FLORIDA STATE LAW CLAIMS AGAINST DEFENDANTS FRANKOWITZ, BSO & ARMOR**

246. This is an action for damages in excess of $15,000.00, arising in Broward County, Florida.

247. The Plaintiff resides in Broward County, Florida.

248. On or about February 18, 2016, to April 1, 2016, SCOTT ISRAEL was the Sheriff of Broward County. Said Defendant is responsible, as Sheriff, for the conduct of ARMOR

and its employees as he has retained ARMOR to provide medical care for all inmates in the Broward County Jail. ISRAEL is also responsible, as Sheriff, for the conduct of all deputies and corrections officers in his employ and ensuring that his deputies, corrections officers, employees, servants, and agents obey the laws of the State of Florida and the United States. Said Defendant is being sued in his official capacity.

249. On or about February 18, 2016, to April 1, 2016 ARMOR, was a Florida corporation doing business as a provider of healthcare within the Broward County jail system in Broward County, Florida.

250. Defendant, FRANKOWITZ, currently resides at 2694 Center Court Drive, Weston, FL 33332 in Broward County.

251. At all material times, Defendant FRANKOWITZ was an agent or employee who was acting within the course and scope of his employment with ARMOR.

252. At all times material hereto, defendant, FRANKOWITZ, was licensed to practice medicine in Florida and was engaged in the practice of medicine in Pompano, Broward County, Florida.

253. Plaintiffs have complied with the requirements of § 766.106(2), Fla. Stat., by mailing a notice of intent to initiate litigation for medical negligence to defendants ARMOR, and FRANKOWITZ by certified mail, return receipt requested. Copies of the notices of intent to initiate litigation for medical negligence and the return receipts are attached hereto as Exhibit 10 and incorporated herein by reference.

254. Plaintiff's attorney certifies pursuant to § 766.104, Fla. Stat., that he made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good-faith belief that there was negligence in the care and treatment of Mr.

Burrell that caused his death.

255. A reasonable investigation gave rise to a good-faith belief that grounds exist for an action against each named defendant. The good faith is exhibited by the written opinion of Dr. Cohen, Dr. Fournier and Dr. Bober which was attached to the notice of intent to initiate litigation for medical negligence.

256. Dr. Robert Cohen is a board-certified internal medicine doctor and licensed physician in the state of New York and has registered as a Medical Doctor Expert Witness in Florida. He was the Director of Montefiore Medical Center for Rikers Island Health Services and has 35 years of experience in Correctional Medicine. For 28 years ending November 31, 2016, he has had an active clinical practice in the area of internal medicine and has been appointed by several federal and state judges as a court-appointed monitor regarding the provision of medical care in prisons and jails in Michigan, Florida, Philadelphia, New York and Ohio.

257. Dr. Arthur Fournier is board certified in internal medicine and is licensed in the Commonwealth of Virginia, he is registered as a Medical Doctor Expert Witness in Florida. For 35 years he taught and practiced family medicine and general internal medicine at the University Of Miami Miller School Of Medicine. He continues to teach internal medicine and family medicine to medical students and residents affiliated with the University of Miami.

258. Dr. Daniel Bober is board certified in general psychiatry, forensic psychiatry and addiction medicine in the state of Florida where he maintains an active practice treating patients. He is currently an assistant clinical professor of Psychiatry at the Yale University School of Medicine and the New York University School of Medicine.

259. FRANKOWITZ's negligent care and treatment of Mr. Burrell is outlined in

paragraphs 182, 184, 185, 186.

260. It has been determined by plaintiff's experts, that the medical care provided by Defendant FRANKOWITZ represents a breach of the prevailing professional standard of care, any or all of which were departures from the accepted standard of care and treatment rendered by physicians of ordinary skill and learning in Broward, Florida, and similar medical communities.

261. As a direct and proximate result of the negligent care provided by FRANKOWITZ Scott Burrell died a horrible and preventable death from medical negligence.

**COUNT 11: MEDICAL NEGLIGENCE CLAIM AGAINST DEFENDANT FRANKOWITZ**

262. Plaintiff incorporates by reference paragraphs 5, 23-45 and 246 through 261 of this Complaint as if specifically set forth herein and further states as follows:

263. Defendant FRANKOWITZ owed a reasonable duty of care to Mr. Burrell while he was his patient from March 3, 2016 to April 1, 2016, and all other times while under his care.

264. Defendant FRANKOWITZ negligently breached his duty owed to Mr. Burrell in that said defendant did or failed to do one or more of the following acts:

i. Failed to treat Mr. Burrell's obvious psychosis.

ii. Failed to refer Mr. Burrell to an appropriate facility for treatment of his obvious psychosis.

iii. Failed to perform an adequate history and physical examination.

iv. Failed to recognize the seriousness of Mr. Burrell's medical condition.

v. Failed to refer Mr. Burrell to an appropriate healthcare facility for treatment

of his obvious abdominal infection.

vi. Failed to correctly interpret Mr. Burrell's laboratory studies.

vii. Failed to recognize the critical nature of Mr. Burrell's vital signs and laboratory values.

viii. Failed to properly diagnosis Mr. Burrell's medical condition.

ix. Failed to order imaging studies.

x. Failed to consult an infectious disease doctor or any properly trained and competent doctor.

xi. Failed to include an abdominal infection and/or peritonitis in the differential diagnosis.

xii. Failed to properly diagnose Mr. Burrell's serious medical condition;

xiii. Failed to properly treat and care for Mr. Burrell;

xiv. Failed to have Mr. Burrell transferred to an outside hospital in a timely manner;

xv. Failed to order emergency laboratory and radiology studies to evaluate the cause of Mr. Burrell's abdominal pain;

xvi. Failed to properly monitor Mr. Burrell's condition.

265. As a direct and proximate result of the negligence of FRANKOWITZ Mr. Burrell suffered a slow, painful and totally preventable death.

266. Defendant FRANKOWITZ as outlined above were (1) of gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; (2) of such entire want of care that would raise the presumption of conscious indifference; (3) show a wantonness or recklessness or a grossly careless disregard for the public's safety and welfare; or (4) done with reckless indifference to the

rights of others including Mr. Burrell that is equivalent to an intentional violation of those rights. Therefore, Plaintiff is making a claim for punitive damages against Defendant FRANKOWITZ.

**WHEREFORE**, PLAINTIFFS demand judgment against FRANKOWITZ, for compensatory and punitive damages in excess of $10,000,000 exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which PLAINTIFFS may be entitled and PLAINTIFFS demand a trial by jury of all issues so triable.

**COUNT 12: VICARIOUS LIABILITY CLAIM AGAINST ARMOR**

267. Plaintiffs incorporate by reference paragraphs 23-45 and 246 through 261 of this complaint as if specifically set forth herein and further states as follows:

268. At all times material to this Complaint Defendants FRANKOWITZ, KESSON, MARTIN, MIZRAHY, MONICAL, JONES, RELL and MCDONALD were all acting within the course and scope of their employment as employees of Defendant ARMOR. Defendant ARMOR was responsible for providing healthcare within the Broward County jail system. The acts of negligence occurred within the Broward County jail and those acts caused Mr. Burrell's death.

269. Defendants FRANKOWITZ, KESSON, MARTIN, MIZRAHY, MONICAL, JONES, RELL and MCDONALD owed a reasonable duty of care to Mr. Burrell as he was their patient in March and April of 2016.

270. At all times material to this Complaint FRANKOWITZ was an employee of Armor Correctional Health Services, Inc., a Florida Corporation when he negligently breached the duty of care he owed to Mr. Burrell in that he did or failed to do one or more of the following acts as outlined in paragraph 264 above.

271. At all times material to this Complaint MARTIN, was an employee of Defendant ARMOR when he negligently breached the duty of care he owed to Mr. Burrell. On March 2, 2016, he ordered Mr. Burrell be placed in solitary confinement knowing that Mr. Burrell was mentally ill and knowing the damage that solitary confinement will do to a man who is severally mental ill like Mr. Burrell. On March 3, 2016 he took Mr. Burrell off of the only mental health medication he was taking and failed to provide any other medication as a treatment and left him in solitary confinement. Dr. MARTIN failed to properly diagnose, monitor and treat Mr. Burrell's serious mental health condition. On April 1, 2016, just hours before Mr. Burrell died from an abdominal infection Dr. MARTIN evaluated Mr. Burrell, found him to be in critical condition and failed to treat or diagnose Mr. Burrell, order an emergency evaluation, conduct an abdominal examination, order emergency laboratory and radiology studies, contact anyone who could have provide care or have him transferred to an outside hospital for care.

272. At all times material to this Complaint KESSON was an employee of Defendant ARMOR when he negligently breached the duty of care he owed to Mr. Burrell. On March 11, 15 and 25 he failed to treat, diagnose, monitor or order a psychiatry referral for Mr. Burrell's serious mental illness and instead left him in a solitary cell knowing that solitary confinement would do additional harm to Mr. Burrell.

273. At all times material to this Complaint JONES was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Burrell in that she did or failed to do one or more of the following acts as outlined in paragraphs 33 and 36 and on March 30, 2016, she found Mr. Burrell covered with urine and feces and in need of wheelchair, suffering from severe abdominal pain, with objective critical vital signs indicating a medical emergency she failed to have Mr. Burrell transferred to an outside hospital for diagnosis and care.

274. At all times material to this Complaint MIZRAHY was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Burrell in that she did or failed to do one or more of the following acts as outlined in paragraph 37 and On March 30, 2016 she found Mr. Burrell confined to a wheelchair, suffering from shortness of breath, covered with blood and feces, complaining of abdominal pain and with critical vital signs. She failed to treat or diagnose Mr. Burrell, order an emergency evaluation, conduct an abdominal examination, order emergency laboratory and radiology studies or have him transferred to an outside hospital for care.

275. At all times material to this Complaint RELL was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Burrell in that she did or failed to do one or more of the following acts outlined in paragraphs 36 and on March 30, 2016, she was contacted by BSO's correctional officers who were concerned about Mr. Burrell's health and she found Mr. Burrell laying in a fetal position with his jail uniform covered with urine, fresh feces and vomit. Per the medical chart at this time Mr. Burrell was confused and wanted to go to a different floor to see his wife who he thought was waiting for him. LPN RELL recorded that Mr. Burrell had critical vital signs that indicated a medical

emergency and that when the feces where cleaned form Mr. Burrell's body he winced with pain from his abdomen. LPN RELL failed to diagnose or treat Mr. Burrell for this medical emergency, order any tests, contact any other medical providers or have Mr. Burrell transferred to an outside hospital for care.

276. At all times material to this Complaint MONICAL, was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Burrell in that she did or failed to do one or more of the following acts as outlined in paragraphs 34 and on March 30, 2016, she found Mr. Burrell suffering from an abdominal infection, with critical vital signs, a history of incontinence, disorientation, fever, and hypotension. She failed to contact any physician, conduct any type of abdominal examination or have Mr. Burrell transferred to an outside hospital for care.

277. At all times material to this Complaint MCDONALD was an employee of Defendant ARMOR when she negligently breached the duty of care she owed to Mr. Burrell in that she did or failed to do one or more of the following acts as outlined in paragraph 37 and on April 1, 2016 she evaluated Mr. Burrell who was wearing a diaper and found him with green vomit on a towel by his bed side, an altered mental status, still critical vital signs, a distended and painful abdomen, signs for dehydration and a history of incontinence, disorientation, fever, hypotension and critical laboratory values. She failed to diagnose or treat Mr. Burrell for this medical emergency, order any tests, contact any other medical providers or have Mr. Burrell transferred to an outside hospital for care.-

278. As a direct and proximate result of the negligence of Defendants FRANKOWITZ, KESSON, MARTIN, MIZRAHY, MONICAL, JONES, RELL, MCDONALD and others

Mr. Burrell died a slow, horrible and preventable death.

279. Defendant, ARMOR is a Florida Corporation and was the employer of all the above listed individuals when they committed the tortious acts that either individually or in conjunction with one another either jointly or severally caused or contributed to Mr. Burrell's death. All of the above listed individuals were acting within the course and scope of their employment with ARMOR and therefore ARMOR is vicariously liable for their negligence and Mr. Burrell's resulting death.

**WHEREFORE**, Plaintiffs demands judgment against defendant, ARMOR, for compensatory and punitive damages jointly and severally with all other Defendants exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which Plaintiffs may be entitled and Plaintiffs demands a trial by jury of all issues so triable.

## COUNT 13: VICARIOUS CLAIM AGAINST BSO BASED ON THE NON-DELEGABLE DUTY TO PROVIDE HEALTHCARE

280. Plaintiff incorporates by reference paragraphs 1-3, 11, 12, 23-45, 137-147, 149, 168-177 and 246 - 264 of this Complaint as if specifically set forth herein and further states as follows:

281. ISRAEL as the Sheriff of Broward County owes a non-delegable duty to provide healthcare to inmates in the Broward County jail system.

282. ISRAEL has contracted with Defendant ARMOR to carry out this non-delegable duty.

283. As outlined in paragraphs 23-45 and 268-279 above ARMOR's employees'

breached the duty to provide non-negligent medical care to Mr. Burrell when they were carrying out BSO's non-delegable duty to provide healthcare; this negligence caused his death.

284. BSO is vicariously liable for the damages caused by ARMOR and ARMOR's employees and Mr. Burrell's death.

**WHEREFORE**, Plaintiffs demands judgment against BSO for compensatory damages in excess of $10,000,000 jointly and severally with all other defendants exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which Plaintiffs may be entitled and Plaintiffs demand a trial by jury of all issues so triable.

## COUNT 14: VICARIOUS CLAIM AGAINST BSO BASED ON THE AGENCY RELATIONSHIP BETWEEN ARMOR AND BSO

285. BSO entered into a contract with ARMOR whereby ARMOR agreed to provide healthcare within the Broward County Jail for BSO. Plaintiff also incorporates by reference paragraphs 1-3, 11, 12, 137-147, 149, 168-177 and 246 - 264 of this Complaint.

286. As outlined in paragraphs 23-45 and 268-279 herein ARMOR's employees breached the duty to provide non-negligent medical care to Mr. Burrell when they were carrying out their contractual duties.

287. This failure to provide the appropriate level of medical care outlined as in paragraphs 23-45 and 268-279 occurred within the course and scope of said employees employment and these acts of negligence caused Mr. Burrell's death.

**WHEREFORE**, Plaintiffs demand judgment against BSO for compensatory damages in excess of $10,000,000 jointly and severally with all other defendants exclusive of costs and

interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which Plaintiffs may be entitled and Plaintiffs demand a trial by jury of all issues so triable.

**COUNT 15: CLAIM AGAINST BSO BASED ON THE CONTRACT**

288. ISRAEL has a duty to provide healthcare to inmates in the Broward County jail system. Plaintiff also incorporates by reference paragraphs 1-3, 11, 12, 137-147, 149, 168-177 and 246 - 264 of this Complaint

289. In 2014 ISRAEL entered into a contract with ARMOR to provide healthcare in the jails for BSO.

290. In 2014 ISRAEL knew or should have known that since 2004 ARMOR had failed to provide non-negligent medical care in the jails and that the negligence of ARMOR's employees had caused the deaths and several inmates as outlined in paragraphs 1, 2 and 23-136 herein and has resulted in serious medical injuries to many more inmates during the same time period.

291. Knowing ARMOR did not provide the appropriate level of medical and mental healthcare to its' patients, ISRAEL entered into a flawed contract with ARMOR with the foreseeable result being that other inmates would be injured and die, including Mr. Burrell in April of 2016.

292. ISRAEL breached his duty to provide non-negligent healthcare to inmates in his jails by entering into the flawed contract with ARMOR, a company with a substantial track-record of providing negligent medical care in the Broward jails.

293. Said contract contains perverse incentives for ARMOR and equally perverse disincentives for BSO.

294. The flaws in the contract are set forth herein in paragraph 3. In addition based on the contract ARMOR is paid a flat fee of $25,000,000.00 per year to provide all healthcare within the Broward County Jail system. Therefore, because this is a flat fee, ARMOR is incentivized to reduce costs by not sending inmates to outside hospitals for care as that costs comes out of ARMOR's flat and by offering as little care as possible to inmates within the jail to reduce its overhead.

295. Sheriff ISRAEL was aware or should have been aware that employing ARMOR, a company with a track-record of providing negligent care, would result in inmate injury and death. Sheriff ISRAEL was aware or should have been aware that entering into the type of contract outlined above would result in BSO not supervising ARMOR and ARMOR providing negligent care to inmates that would result in injury and death.

**WHEREFORE**, Plaintiffs demand judgment against BSO for compensatory damages in excess of $10,000,000 jointly and severally with all other defendants exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which plaintiffs may be entitled and plaintiffs demand a trial by jury of all issues so triable.

**COUNT 16 -- CLAIM AGAINST BSO BASED ITS NEGLIGENT SUPERVISION AND RETENTION OF ARMOR**

296. Sheriff ISRAEL has a duty to provide healthcare to inmates in the Broward County jail system.

297. In 2012 ISRAEL elected Sheriff of Broward County and took over the responsibility of monitoring ARMOR's provision of healthcare within the Broward jails.

298. ISRAEL has delegated this duty to provide inmate healthcare to ARMOR but he

still has the duty to supervise ARMOR's provision of healthcare to inmates in the Broward jails and terminate the contract with ARMOR or not renew it if ARMOR provides negligent care.

299. ISRAEL knew or should have known that since 2004 ARMOR had failed to provide non-negligent medical care in the jails and that the negligence of ARMOR's employees had caused the deaths and several inmates as outlined in paragraphs 1-2 and 23-135 and has resulted in serious medical injuries and deaths to many more inmates during the same time period.

300. From 2012 to April of 2016 ISRAEL failed to supervise ARMOR's provision of healthcare to inmates in Broward County, renewed ARMOR's contract annually and failed to terminate ARMOR as a BSO provider. As a result many inmates, including Mr. Burrell, have died due to the negligence of ARMOR's employees.

301. Even with the knowledge of all the deaths and clear negligence on the part of ARMOR's employees and to fail to supervise ARMOR and has ratified ARMOR's conduct by renewing the contract annually from 2013 to 2017.

**WHEREFORE**, Plaintiffs demands judgment against BSO, for compensatory damages in excess of $10,000,000 jointly and severally with all other defendants exclusive of costs and interest together with costs and prejudgment interest for that portion of the compensatory damages which have been previously liquidated, and any other relief to which plaintiffs may be entitled and plaintiffs demand a trial by jury.

Dated: 10/12/17

Respectfully submitted,

ATTORNEYS FOR PLAINTIFFS

Greg Lauer, Esq.
Lauer & Currie, P.A.
644 Se 5 Avenue
Fort Lauderdale, Fl 33301
Phone:(954) 533-4498
Facsimile:(954) 533-4501

By: S/Greg M. Lauer

Greg M. Lauer
Fla. Bar No. 652709
*greg@law-lc.com*

By: S/Christina M. Currie
Christina M. Currie
Fla. Bar No. 90987
*cmc@law-lc.com*